

**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

NJM:MS
F. #2025R00299

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

June 2, 2025

By ECF

The Honorable Carol Bagley Amon
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

> Re:    United States v. Quazi Mohammad Rezwanul Ahsan Nafis
>          Criminal Docket No. 12-720 (CBA)

Dear Judge Amon:

The government respectfully submits this letter in opposition to defendant Quazi Mohammad Rezwanul Ahsan Nafis's second motion for compassionate release. *See* ECF No. 64. Nafis was sentenced in August 2013 to 30 years in prison for attempting to detonate a weapon of mass destruction in New York City. A supporter of al Qaeda, Nafis attempted to blow up a one-thousand-pound bomb outside the Federal Reserve Bank of New York in an effort to cripple the U.S. financial system and murder numerous innocent people.

In January 2021, this Court denied the defendant's request to reduce his sentence, holding that he had not presented any extraordinary and compelling reason for relief and that the Section 3553(a) factors counseled against resentencing. As of this filing, the defendant has served less than half of his 30-year sentence.

Nonetheless, the defendant now seeks compassionate release for the second time, largely rehashing arguments this Court already rejected in 2021. The only new arguments relate to Nafis's purported rehabilitation and need to care for family members in his home country of Bangladesh. But a defendant's professed rehabilitation, standing alone, cannot amount to extraordinary and compelling reasons for release. *See* 28 U.S.C. § 994(t). And Nafis fails to establish that he is the only person capable of caring for his family members. Moreover, the Section 3553(a) factors cut sharply against resentencing, given the seriousness of defendant's conduct and the need for deterrence and just punishment. For the reasons set forth below, the defendant's second motion for compassionate release should be denied.

I.      Background[1]

    A.      Offense Conduct

Quazi Mohammad Rezwanul Ahsan Nafis is a Bangladeshi citizen who entered the United States from Bangladesh on a student visa in January 2012.  Prior to traveling to the United States, Nafis formed strong anti-American views.  Nafis believed, among other things, that the United States was responsible for killing and raping Muslims all over the world.  He also believed that the United States used its economic power to make puppets of governments in Muslim countries.  While in Bangladesh, the defendant decided to take action based on his religious and political views.  According to numerous recorded statements of the defendant, made during the course of the investigation, he came to the United States for the specific purpose of conducting a terrorist attack.   To this end, prior to coming to the United States, Nafis acquired operable bomb-making instructions and brought these instructions with him to the United States.  He also brought lectures from Anwar al-Awlaki, the deceased leader of al-Qaeda in the Arabian Peninsula ("AQAP") and a preeminent jihadist influencer.

Within months of arriving in the United States, the defendant used and attempted to use the internet to recruit like-minded individuals to help him carry out a terrorist attack.   One of the individuals Nafis contacted was a radical Islamist known to Nafis as "Yaqueen."  Yaqueen proposed attacking a military base in Baltimore with which Yaqueen was familiar, but the defendant demurred, insisting that the target of the attack would need to have a higher public profile to be effective.  The defendant indicated that he wanted his attack to result in "mass destruction" without regard to whether the victims were military or civilian.  The defendant also contacted another individual in the United States known to him as "Fahim."  The defendant repeatedly attempted to recruit Fahim to participate in a terrorist attack, but Fahim declined to join his plan.  The defendant also reached out to individuals overseas to assist him in his plan.  In recorded statements, the defendant reported that he had contacts overseas, including al-Qaeda members, who could assist him in carrying out a terrorist attack.

The defendant ultimately contacted a confidential human source (the "CHS") who unbeknownst to the defendant was providing information to the Federal Bureau of Investigation ("FBI").  The defendant sought to recruit the CHS over the internet into his (the defendant's) jihadist cell.  The defendant told the CHS that he admired Usama bin Laden and that he traveled to the United States to wage jihad.  The defendant also mentioned to the CHS that he was in contact with a "brother" in Bangladesh and discussed becoming a martyr with the CHS, telling the CHS that he (the defendant) had obtained an Islamic ruling from an individual in Bangladesh blessing his plan to conduct a terrorist attack inside the United States.

---

[1]     The facts contained herein are drawn from the Presentence Investigation Report, as well as the government's sentencing memorandum filed in this matter on August 1, 2013.  *See* ECF No. 29.

Based on, among other things, the defendant's aggressive attempts to recruit radical individuals into a jihadist cell, his statements concerning his intentions to conduct a terrorist attack, his connections overseas, and indications that he possessed bomb-making instructions (which later proved correct), the government conducted a sting operation.

As part of the sting operation, the CHS offered the defendant an opportunity to meet with an al-Qaeda facilitator in the United States who could help carry out his plan, if he so wished. The defendant eagerly and emphatically expressed his desire to meet with this purported al-Qaeda facilitator; he was told to contact the purported al-Qaeda facilitator only if he was ready to carry out a terrorist attack. The defendant indicated that he was ready and contacted the purported al-Qaeda facilitator. In no uncertain terms, the defendant stated that he wanted assistance from al-Qaeda in launching a terrorist attack in the United States.

On July 19, 2012, an undercover law enforcement officer posing as an al-Qaeda member and facilitator (the "UC"), spoke with the defendant and arranged a meeting in Central Park several days later. On July 24, 2012, the defendant met the UC in Central Park. During that meeting, the defendant told the UC, in sum and substance, that he wished to launch a terrorist attack against the United States. The defendant further told the UC, in sum and substance, that he was collaborating with two other individuals—referring to Yaqueen and the CHS—and that those individuals also wanted to participate in the attack. The defendant stated, "We are ready for action." He then added, in sum and substance, that he, Yaqueen and the CHS "don't care anything about our work. We just want to meet our lord as soon as we can." The defendant continued:

> What I really mean, is that I don't want something that's like, small. I just want something big. Something very big. Very very very very big, that will shake the whole country, that will make America, not one step ahead, change of policy, and make one step ahead, for the Muslims . . . that will make us one step closer to run the whole world . . . .

On August 5, 2012, the defendant told the UC, in sum and substance, that he was considering the New York Stock Exchange as a possible target. On August 9, 2012, FBI agents conducting surveillance of Nafis observed him in the area of the Stock Exchange, apparently as part of the defendant's efforts to assess its suitability as a target. Surveillance agents also observed the defendant appearing to take notes while he was in the area of the Stock Exchange.

On August 11, 2012, the defendant met with the UC in a hotel room in Queens, New York. During that meeting, the defendant confirmed that he wanted to target the financial district of Manhattan—specifically, the New York Stock Exchange. The defendant told the UC, in sum and substance, that he wanted to use explosives as part of a suicide attack, either contained in one or more cars, or strapped to his person. The defendant explained, "We are going to need a lot of TNT or dynamite." The defendant also provided the UC with a handwritten map that he had apparently prepared while scouting the area around the Stock Exchange on August 9, 2012. The defendant asked the UC whether approval for the proposed

3

attack would come from the "top" of the al-Qaeda leadership. The UC responded, in sum and substance, that he was going to meet with al-Qaeda leadership and advise them about the plan. The defendant and the UC then traveled to the financial district in Manhattan, where the defendant took several photographs of prospective targets.

On August 23, 2012, the defendant again met with the UC in a hotel room in Queens, New York. Just a few minutes after arriving at that meeting, the defendant asked, "The thing that I want to ask you about is that, the thing that I'm doing, is it under al-Qaeda?" The UC responded in the affirmative. The UC subsequently asked the defendant what he needed to carry out his proposed attack, and Nafis explained that he needed a "big car with lots of fruits and vegetables in there which can blow up the whole New York Stock Exchange building." The defendant added that he needed "to make sure that this building is gone." He told the UC that he understood and was committed to al-Qaeda's ideology. The defendant also asked the UC why the UC did not join him in carrying out the attack. Specifically, the defendant asked, "Can I ask you something? Why aren't you (inaudible) to drive the car yourself? Why don't you want to be shahid [martyr]?" The UC responded, in sum and substance, that it was his role to facilitate Nafis's attack. At the conclusion of that August 23, 2012 meeting, the UC advised the defendant that the UC was going to travel overseas to meet with al-Qaeda leadership to discuss his proposed attack. The UC further told Nafis that the UC would contact Nafis again when the UC returned.

On August 26, 2012, FBI agents performing surveillance again observed the defendant in the area of the financial district, apparently again for the purpose of scouting the location for his proposed attack.

The next day, on August 27, 2012, the defendant told the CHS that he believed that he (the defendant) was now a member of al-Qaeda and that they were obtaining final approvals for the attack from al-Qaeda leadership. Later during the same discussion, the defendant told the CHS, in sum and substance, that his upcoming attack was going to be a "one man job," indicating that Nafis did not want the CHS or Yaqueen to be directly involved in the attack on the financial district. The defendant and the CHS then discussed how the CHS and Yaqueen might launch their own attacks after the defendant's attack was complete.

On September 15, 2012, following the UC's purported return to the United States, the defendant again met with the UC in a hotel room in Queens, New York. During that meeting, Nafis told the UC, in sum and substance, that he wanted to launch an attack on the financial district involving explosive devices in multiple cars with other individuals participating in the attack. The defendant also confirmed that he was ready to kill himself during the course of the attack, but indicated that he wanted to return to Bangladesh to see his family one last time to set his affairs in order. In addition, the defendant told the UC that, for operational reasons, he was considering attacking the Federal Reserve Bank instead of, or in addition to, the New York Stock Exchange. The defendant also told the UC, in sum and substance, that he understood that the attack he was planning would result in a large number of civilian casualties, including of women and children, but still wanted to proceed with the attack.

4

On September 20, 2012, the defendant once again told the UC that he wanted to return to Bangladesh prior to launching his suicide attack in the United States to set his affairs in order. The UC responded, in sum and substance, that the defendant was free to return to Bangladesh at any time, but that if he did so, he could not participate in the attack due to security concerns. The defendant reacted with frustration and anger to the UC's position. During a subsequent telephone call on September 23, 2012, the defendant urged the UC, in sum and substance, to remind the al-Qaeda leadership both that the defendant had come up with the attack plan himself, and that he had specifically traveled to the United States for the purpose of conducting a terrorist attack.

On September 27, 2012, the defendant again met with the UC. At the beginning of that meeting, the UC explained to Nafis, in sum and substance, that the al-Qaeda leaders with whom the UC had purportedly consulted at Nafis's request would not wait for Nafis to return from Bangladesh before carrying out the attack due to operational security concerns. However, they had authorized the defendant to use a remote-controlled explosive device, rather than launching a suicide attack. The UC explained that as a result, the defendant could participate in the attack, if he so wished, and later return to Bangladesh to set his affairs in order. The UC then asked the defendant whether he wanted to continue to move forward with the plot, and the defendant repeatedly confirmed that he was committed to carrying out an attack on the financial district. Indeed, the defendant was excited by the new plan to detonate the explosive device remotely because, he indicated, it would allow him to conduct additional terrorist attacks on U.S. soil.

On October 4, 2012, the defendant and the UC met and traveled to a warehouse in the Eastern District of New York (the "Warehouse"). Prior to that meeting, the defendant had obtained numerous items for use in the explosive device at the UC's request, including batteries and other electrical components. During the meeting, the defendant and the UC purchased additional components to construct the explosive device, including large garbage bins to contain the purported explosive material. The defendant told the UC, in sum and substance, that they should return to the financial district during their next meeting to finalize exactly how they would carry out the attack and escape. Nafis told the UC: "We need to make a very concrete plan." In addition, when the UC asked whether Nafis was ready to proceed with the attack, Nafis responded: "There is nothing stopping me."

On October 12, 2012, the defendant and the UC met and transported what the defendant believed to be explosive material to the Warehouse. Upon arriving at the Warehouse, the defendant and the UC offloaded approximately twenty fifty-pound bags of this purported explosive material into a trailer. The defendant also gave the UC a tarp that he had previously purchased to cover the purported explosive device when it was placed in the van. He also provided the UC with a thumb drive containing an article he had written about his motivations for his attack. Nafis believed that this article would be published by Inspire magazine. In that article, Nafis included quotations from "[o]ur beloved Sheikh Osama bin Laden" to justify the fact that his plot likely involved the killing of women and children. The defendant also stated the following:

5

all I had in my mind are how to destroy America . . . I came up to this conclusion that targeting America's economy is most efficient way to draw the path of obliteration of America as well as the path of establishment of Khilapha [caliphate].

I decided to attack the Federal Reserve bank of New York which is by far the largest (by assets), most active (by volume) and most influential of the 12 regional Federal Reserve Banks.  New York Federal Reserve Bank implements monetary policy, supervises and regulates financial institutions and helps maintain the nation's payment systems.

Shortly after this October 12, 2012 meeting, the defendant called the UC and informed the UC that he had purchased a second mobile telephone that he would use to place the cellular telephone call to trigger the detonator for the bomb.

On October 13, 2012, as previously suggested by the defendant, the defendant and the UC returned to the financial district so the defendant could scout the site for his upcoming attack.  During the drive to the financial district, the defendant plugged the thumb drive into his computer and read aloud his article that he intended to be published in Inspire.

On October 15, 2012, the UC called the defendant and advised that they would be ready to proceed with the attack on October 17, 2012. The defendant agreed and indicated, in sum and substance, that he was eager to proceed with the attack on that day.  The next evening, on October 16, 2012, the defendant called the UC and stated, in sum and substance, that he wanted to "add something" to the planned attack, and that he wanted the attack "to happen, no matter what."

In the early morning of October 17, 2012, Nafis and the UC met and drove to the Warehouse in a van (the "Vehicle").  During this drive to the Warehouse, Nafis told the UC, in sum and substance, that he had a "Plan B," which involved changing the attack into a suicide bombing operation in the event that Nafis believed the attack was about to be thwarted by police. After arriving at the Warehouse, Nafis assembled the purported one-thousand-pound explosive device, pouring the bags containing the inert explosive material into the trash bins and placing them inside the Vehicle.  He also installed components for the purported detonator.  As the defendant and the UC prepared to leave the Warehouse, the defendant collected the empty bags that had contained the inert explosive material and placed them in the van.  Nafis then told the UC, in sum and substance, that he was collecting the extra bags because he believed that there might be residual explosive materials in the bags that would contribute to the strength of the anticipated detonation and kill more people.

The UC then drove the Vehicle from the Warehouse with Nafis in the passenger seat to the New York Federal Reserve Bank.  During this drive, the defendant explained that his jihadist views were shaped, in part, by videotaped sermons of Anwar al-Awlaki.  In addition, Nafis told the UC that he wanted to record a video statement prior to detonating the device.

6

Before entering Manhattan, Nafis armed the purported explosive device for detonation by turning on the cellular phone to be used in the detonator, installing the battery in the detonator, and connecting the wires linking the detonator to the purported explosive materials.

Upon arriving at the New York Federal Reserve Bank, the defendant and the UC parked the Vehicle, exited, and walked to a nearby hotel.  Once inside a room at the hotel, Nafis told the UC to film a video statement Nafis wanted to make concerning the attack. During a video recorded statement to the American public, Nafis stated: "We will not stop until we attain victory or martyrdom."

While making his video statement, the defendant covered his face, wore sunglasses, and disguised his voice.  After completing the video, the defendant repeatedly attempted to detonate the purported bomb by placing multiple telephone calls to the cellular telephone that he had installed as the initiating device for the detonator.  By placing these calls, Nafis was attempting to detonate the purported bomb inside the Vehicle, which was parked next to the New York Federal Reserve Bank.

B.      Procedural History

The defendant was arrested on October 17, 2012, shortly after attempting to trigger the purported bomb.  On February 7, 2013, the defendant pleaded guilty before this Court to Count One of the Indictment, which charged him with attempting to use a weapon of mass destruction, in violation of Title 18, United States Code, Section 2332a(a).  On August 9, 2013, the Court sentenced Nafis to 30 years' imprisonment.  In pronouncing the sentence, the Court explained:

> The seriousness of the offense to which this defendant entered his guilty plea is perhaps exceeded only by the offense he would have committed had this plot been successful.  The defendant's goal was to detonate a thousand pounds of explosives outside of the Federal Reserve Bank, destroying that building, killing its inhabitants as well as the unfortunate men, women and children who may have been in the vicinity.  Thankfully, in pursuing his goal, he encountered sources and an undercover agent of the Federal Bureau of Investigation.  Indeed, today even the defendant purports to be grateful for that fact.
>
> I am persuaded that the defendant was a serious threat to the safety of New Yorkers, Americans and that he would have executed this plan or a similar, perhaps less grand one, had he not been discovered by the men and women of both our federal law enforcement and local law enforcement communities who work so tirelessly to protect us from plots fostered by the very type of blind hatred that influenced this defendant.

Sentencing Tr. (August 9, 2013) at 41, ECF 59-1.

The Court entered its Judgment on August 15, 2013. The defendant filed a notice of appeal on that same date, but subsequently withdrew the notice. On January 14, 2014, the Court of Appeals issued its mandate so-ordering the stipulation withdrawing the defendant's appeal.

On May 11, 2018, the defendant submitted a petition pursuant to Title 28, United States Code, Section 2255, to have his conviction overturned or, in the alternative, to be resentenced. ECF No. 52. He challenged his sentence on several grounds, including that his counsel provided ineffective assistance in violation of his Sixth Amendment rights, that his Fourth Amendments rights were violated by the government's decision to not arrest him sooner, and that the government encouraged him to increase the scope and nature of the destruction he planned. On April 8, 2020, the Court denied his petition in its entirety. ECF No. 56.

On October 15, 2020, the defendant submitted an application for a reduction in sentence. He argued that his release was warranted in light of the Supreme Court's decision in *Johnson v. United States*, 576 U.S. 591 (2015); because, at the time of his offense at age 21, he suffered from mental health conditions and his brain had not fully developed; because he was remorseful; and because the dangers presented by the COVID-19 pandemic constituted extraordinary and compelling circumstances. *See* ECF 61. On January 11, 2021, this Court denied the motion in full. It held that the defendant had not demonstrated extraordinary and compelling reasons for release and that the sentencing factors set forth in 18 U.S.C. § 3553(a) weighed against a reduced sentence. *Id.* As relevant here, the Court held that the defendant' remorse, his youth at the time of the offense, and his mental health conditions did not rise to the level of extraordinary and compelling circumstances. *Id.* at 5. Indeed, the Court emphasized that these same factors had already been fully considered at sentencing—where the defendant had received a sentence at the low end of the applicable Guidelines range. *Id.* at 5–6.

On July 22, 2024, the defendant submitted a second motion for a reduced sentence. *See* ECF No. 64. He again argues—for at least the third time—that his remorse, along with his age and mental health at the time of the offense, warrant a reduced sentence. *Id.* His only new arguments relate to his purported rehabilitation and the need to care for his elderly parents and grandparent in Bangladesh. *Id.* But Congress has precluded rehabilitation, standing alone, from amounting to extraordinary and compelling circumstances. And the defendant has failed to establish that he is the only person capable of caring for his aging parents, or that their need for care would justify resentencing a convicted terrorist who sought to detonate a massive bomb in the heart of the nation's financial system.

II.     Legal Standard

A compassionate release motion is a request for a permanent reduction in a defendant's federal sentence. Generally, a district court "may not modify a term of imprisonment once it has been imposed." 18 U.S.C. § 3582(c); *see Dillon v. United States*, 560 U.S. 817, 824–25 (2010). Compassionate release is one of the few exceptions to this rule,

8

allowing a court to "reduce the term of imprisonment (and . . . impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment)." 18 U.S.C. § 3582(c)(1).  The defendant bears the burden of showing that a reduced sentence is justified.  *See United States v. Tranese*, No. 17-CR-559 (CBA), 2021 WL 25371, at *1 (E.D.N.Y. Jan. 4, 2021).

In assessing whether a sentence reduction is appropriate, this Court must consider both whether the defendant has presented an "extraordinary and compelling" reason for early release and the 18 U.S.C. § 3553(a) sentencing factors.  *See United States v. Jones*, 17 F.4th 371, 373 (2d Cir. 2021).  The Court should deny a defendant's motion if it concludes that either: (1) the defendant has not presented an extraordinary and compelling reason for his release or (2) the Section 3553(a) factors weigh against release.  *See id.* (explaining that, "[a] district court's reasonable evaluation of the § 3553(a) factors is [] an alternative and independent basis for denial of compassionate release") (citation omitted).[2]

II.     The Second Motion for Compassionate Release Should Be Denied

A.     The Defendant Has Not Demonstrated Extraordinary and Compelling Reasons For His Release

As was true in 2021, *see* ECF No. 61, the defendant fails to demonstrate any extraordinary and compelling reasons for release.  He does not point to any material change in his own health or conditions of confinement, nor to any change in law that would provide a basis for resentencing.  He recycles arguments about his remorse and his age and mental health at the time of his offense.  But as this Court correctly recognized in denying his first motion for compassionate release, the defendant has previously presented, and the Court has previously considered, these very same arguments.  *See*, *e.g.*, First Motion for Sentence Reduction, ECF No. 57 at 8 (arguing that, "at the time of the offense [the defendant] was not functioning as an adult with an adult state of mind . . . [b]ut rather as a teenager, and today is remorseful and learned from his mistake."); Sentencing Transcript, ECF No. 58-1, at 18:1–4 ("[The defendant is] a young person.  He's barely out of adolescence.  He was 21 years old when he committed this offense."), 20:15–23 ("[H]e had a damaged and frail psyche.  He was depressed.  He had a breakup with a girl that resulted in suicidal ideation.  He was suffering completely unresolved post-traumatic stress disorder. . . . [H]e met other students who were highly radicalized . . . and Nafis adopted their views."); 40:20–41:5 (Court acknowledging at sentencing that "counsel, with support of a psychological report, has pointed to a constellation of psychological problems of the defendant . . . . [I]t's clear . . . today, even today, that he is clearly impressionable.").  Just as

---

[2]     To bring a motion for compassionate release, the defendant must also exhaust his administrative remedies.  Here, the defendant submitted an administrative request dated September 22, 2022, seeking compassionate release.  *See* ECF No. 64-1.  According to records maintained by the Bureau of Prisons, that request was denied on January 25, 2023.  The government therefore agrees with the defendant that he has exhausted his administrative remedies.

9

before, these factors do not present any extraordinary and compelling basis to resentence the defendant. *See* ECF No. 61.

With the above avenues unavailable, the defendant falls back on a claim that he has been rehabilitated and should be released to care for his aging parents abroad. However, by statute, rehabilitation alone cannot constitute an extraordinary and compelling basis for resentencing. *See* 28 U.S.C. § 994(t) ("Rehabilitation of the defendant alone shall not be considered an extraordinary and compelling reason."). And while the defendant claims to be a changed man, he has served less than half of his 30-year-sentence for attempting to detonate a weapon of mass destruction in one of the most densely populated areas of the country. In that context, any purported rehabilitation does not rise to the level of an extraordinary and compelling circumstance.

Nor does the health of the defendant's family members provide a basis for resentencing. The relevant policy statement in the Sentencing Guidelines provides that "[t]he incapacitation of the defendant's parent" is an extraordinary and compelling reason for resentencing when "the defendant would be the only available caregiver for the parent." U.S.S.G. § 1B1.13(b)(3)(C). To satisfy this standard, "courts generally require a showing of evidence from several sources indicating that the defendant is the only available caregiver for a family member in dire conditions." *United States v. Lindsey*, No. 13-CR-271 (LTS), 2021 WL 37688, at *3 (S.D.N.Y. Jan. 4, 2021) (quotations omitted).

Here, the defendant fails to explain why *he* is the only person capable of caring for his mother, father, and grandmother. While he states that his sister has moved to a different region of Bangladesh and has her own responsibilities, he does not explain why the numerous other family members and friends who submitted letters on his behalf cannot care for his family. *See* ECF No. 64-1, 64-2. Nor does he explain why his family cannot access care through public or private programs, or describe how they are receiving care currently.

Courts in this Circuit routinely decline to find extraordinary and compelling reasons where a defendant fails to explain why alternative options for care are unavailable. *See, e.g.*, *United States v. Romano*, No. 22-CR-12 (KAM), 2023 WL 8735203, at *3 (E.D.N.Y. Dec. 19, 2023) (defendant did not present extraordinary and compelling reasons for release where he failed to explain "whether household members, friends in the community, or relatives other than his siblings, mother, and nephew would have the time, money, and resources to help his father") (citations omitted); *United States v. Golfo*, No. 19-CR-95 (KAM), 2022 WL 6162424, at *2 (E.D.N.Y. Oct. 6, 2022) (same where the "[d]efendant has not presented sufficient evidence . . . that she is the *only* available caregiver for her parents."); *Lindsey*, 2021 WL 37688, at *3 (same where defendant failed to establish that "no other family member or other caretaker [was] capable of providing the necessary care"); *United States v. Chambliss*, No. 09-CR-274 (CS), 2022 WL 4110246, at *2 (S.D.N.Y. Sept. 7, 2022) (denying compassionate release where "there is no indication that [the defendant] is the only family member who could assist his relatives"); *United States v. Mojica*, No. 19-CR-629 (CS), 2020 WL 6746478, at *1 (S.D.N.Y. Nov. 16, 2020) (denying motion for compassionate release based on "the need for [the defendant] to help

10

with his ailing mother and autistic son," where both had others caring for them, and noting that "hardship on the family almost always results from serious criminal conduct").

The defendant suggests that in Bengali culture it is his responsibility as the eldest son to care for his parents as they age. Mot. at 9. Although his professed desire to assist his ailing parents is laudable (if self-serving), "[b]eing ... unavailable to care for aging parents [is] but [a] sad and inevitable consequence[] of incarceration." *United States v. John*, No. 15-CR-208, 2020 WL 6581217, at *2 (S.D.N.Y. Nov. 10, 2020). Because the defendant has not established extraordinary and compelling grounds for resentencing, his second motion for compassionate release should be denied.

B.    The Section 3553(a) Factors Weigh Heavily Against Any Reduction in Sentence

Even if extraordinary and compelling reasons were to exist here (they do not), the Court should still deny the defendant's motion based on the relevant Section 3553(a) factors. The defendant travelled to this country to commit a terrorist attack. He reached out repeatedly to individuals he believed to be associated with a murderous foreign terrorist organization. He took numerous steps towards planning a mass-casualty incident in the United States, rejecting his co-conspirators' plans as insufficiently violent. And ultimately, he attempted to detonate what he believed to be one thousand pounds of explosives outside the Federal Reserve Bank of New York—hoping both to destabilize the U.S. financial system and to kill scores of innocent people. As the Court rightly recognized in sentencing the defendant, "[t]he seriousness of the offense to which this defendant entered his guilty plea is perhaps exceeded only by the offense he would have committed had this plot been successful." Although the defendant has expressed remorse for his conduct, that fact—the defendant's professed remorse—was already taken into account when the Court sentenced the defendant to the low end of the applicable Guidelines range of 30 years to life in prison. Similarly, although the defendant has largely avoided disciplinary issues while incarcerated and claims now to be rehabilitated, he has served less than half of 30-year sentence. Put simply, reducing the defendant's sentence at this stage would not reflect the seriousness of his conduct or provide just punishment for his offense. ECF No. 812 at 14. Indeed, the crime the defendant committed and its potential deadly impact on the community is no less serious now than when he was sentenced in 2013 or when his first compassionate release request was denied in 2021.

Accordingly, given the seriousness of the defendant's conduct and the continued need to deter others from committing similar crimes, a reduction of the defendant's sentence would "fail to achieve the importance policies of the Section 3553(a) factors—namely, providing just punishment, affording adequate deterrence, and promoting respect for the law." *Tranese*, 2021 WL 25371, at *2.

In sum, the Section 3553(a) factors continue to outweigh any otherwise extraordinary and compelling reasons to reduce the defendant's sentence—and there are none. The Court's 30-year sentence remains the appropriate punishment for the defendant's outrageous conduct.

III.    Conclusion

For all the foregoing reasons, the government respectfully submits that the Court should deny the defendant's second motion for compassionate release.

Respectfully submitted,

JOSEPH NOCELLA, JR.
United States Attorney

By:    s/Matthew Skurnik
Matthew Skurnik
Assistant U.S. Attorney
(718) 254-6231

cc:    Clerk of the Court (CBA) (by ECF)
Defense Counsel (by ECF)